UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANDREA M. CHILDRESS, *on behalf of*<br>*herself and others similarly situated*, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) CASE NO. 1:12-cv-00184-TWP-DML |
| v. | ) |
| | ) |
| TRANS UNION, LLC, | ) |
| | ) |
| Defendant. | ) |

## <u>Order on Motion to Disqualify Counsel and Related Matters</u>

Plaintiff Andrea Childress has brought this action against Trans Union, LLC ("Trans

Union") under the Fair Credit Reporting Act ("the Act"). She seeks to represent a nationwide

class of consumers as to whom Trans Union allegedly violated the Act by reporting their

bankruptcies as "dismissed" when they in fact had been voluntarily withdrawn.[1] Ms. Childress is

represented by two lawyers at separate firms—John Cento at Riley Bennett & Egloff LLP and

Eric Pavlack at Pavlack Law LLC. From 2001 through mid 2005, Mr. Cento represented Trans

Union in around 250 cases, defending it against claims brought by individuals under the Act.

Shortly after the filing of this case, Trans Union filed a motion to disqualify Mr. Cento from

representing Ms. Childress and the putative class in this case. (Dkt. 15)[2] Trans Union maintains

that Mr. Cento should be disqualified because the matter on which he now represents the putative

class is substantially related to his former representation of Trans Union, thus rendering his

current representation in violation of Rule 1.9 of Indiana's Rules of Professional Conduct.

---

[1] The complaint actually defines three separate classes, but they are likely interrelated and
overlapping.

[2] Trans Union does not seek to disqualify Mr. Pavlack.

The motion to disqualify is now fully briefed and has been referred to this magistrate judge for decision.  Trans Union and Mr. Cento (through counsel retained to address only the disqualification motion) presented oral argument on May 17, 2012, after which the court took the matter under advisement.

### <u>Facts Pertinent to Analysis</u>

Whether a successive representation is substantially related to a former representation turns, of course, on the nature and scope of those representations.  In this case, that inquiry will focus on Mr. Cento's prior representation of Trans Union, because he defines it narrowly in terms of a number of individual, distinct cases, and Trans Union defines it as something broader than the simple sum of its individual parts.

Mr. Cento represented Trans Union during the course of his employment at Katz & Korin, P.C. ("Katz & Korin") and Schuckit & Associates, P.C. ("Schuckit"), with that representation beginning sometime in 2001 and ending in July 2005.[3]  During Mr. Cento's tenure, the firms handled approximately 25% of Trans Union's consumer-related litigation across the United States.[4]  Mr. Cento himself billed more than 4,200 hours defending Trans Union in over 250 cases.[5]

His work for Trans Union almost exclusively involved defending claims brought under sections 1681e(b) and 1681i of the Act.[6]  Section 1681e(b) requires a reporting agency to take

---

[3]  *See* Trans Union's brief, Dkt. 16, at p. 3-4; Cento's brief, Dkt. 25, Ex. A, Cento Aff. at ¶ 1-2.

[4]  *See* Trans Union's brief, Dkt. 16, Ex. B, Norgle Aff. at 4.

[5]  *See* Trans Union's brief, Dkt. 16, at p. 4. *See also* Trans Union's reply brief, Dkt. 28, at p. 7.

[6]  *See* Trans Union's brief, Dkt. 16, at p.4.  *See also* Trans Union's reply brief, Dkt. 28, at p.7.

"reasonable procedures" to ensure the accuracy of a consumer credit report. 15 U.S.C.A. §
1681e.  Closely related, section 1681i sets forth certain steps a reporting agency must follow
whenever a consumer disputes something on his or her report, a process defined by the Act as a
"reinvestigation."  15 U.S.C.A. § 1681i.

These "reasonable procedures" and "reinvestigation" cases by nature task a lawyer with
different priorities, discovery needs, and potential lines of argument, all turning on the factual
particularities of each claim.  Those facts include how the inaccuracy originated, who or what is
responsible for the inaccuracy, and what reinvestigation steps the reporting agency did or did not
take.[7] Notwithstanding each case's particularities, Mr. Cento's representation of Trans Union
involved certain common denominators, primarily in terms of Trans Union's approach to
handling consumers' disputes, conducting reinvestigations, and defending claims arising out of
its handling of those disputes.  He received a significant volume of internal Trans Union
documents relating to the defense of claims brought under the Act.  And he did not simply work
on individual cases; he supervised other attorneys.  Moreover, a review of the evidence[8] reveals
that Mr. Cento's representation of Trans Union in cases brought under the Act took him into its
inner circles.  In addition to interacting with executives, board members, employees, and outside
counsel, he worked closely with in-house counsel to determine case strategies, identify strengths
and weaknesses of cases, develop settlement and discovery strategies, and both evaluate and

---

[7] *See* Cento's brief, Dkt. 25, at pp. 10-11.

[8] Trans Union has submitted *in camera* some of the evidence considered in this order.  It did so
despite its argument that it is inappropriate for the court to consider protected communications
(1) because revelation of shared confidences would compromise the communications Rule 1.9 is
designed to protect and (2) because once a substantial relationship is established, former counsel
is not entitled to rebut the presumption of shared confidences.  These assertions are addressed in
the Analysis section of this order.

3

prepare witnesses.[9]   For example:

- Trans Union FCRA Litigation In-House Counsel communicated with Mr. Cento and several other outside counsel about a new internal process for sharing information regarding the defense of claims brought against Trans Union.  Trans Union solicited Mr. Cento's input on the new process.

- Mr. Cento communicated with Trans Union personnel, including a Trans Union Senior Attorney, about Trans Union's reasonable procedures and reinvestigation cases computer system and the usefulness of this information in defending cases.

- Mr. Cento and some other outside counsel were copied on several emails among Trans Union personnel, including its FCRA Dispute Processing-Priority Department, which is responsible for lawsuit coordination.  The emails discussed reinvestigations, coordination with the Legal Department, and direction from a Trans Union Senior Attorney about how to handle a broad category of cases.

- A Trans Union Senior Attorney communicated with Mr. Cento and other outside counsel about a potential outside expert witness who could testify in certain types of cases.

Trans Union also provided memos and letters that show Mr. Cento's extensive and generalized involvement with its litigation.  For example:

- Mr. Cento received information from Trans Union's General Counsel documenting the status of 39 reasonable procedures and reinvestigation cases, including whether the case was dismissed or settled and the settlement amounts.

---

[9]  *See* Trans Union's brief, Dkt. 16, Ex. B, Norgle Aff. at ¶ 7.

- Mr. Cento prepared a memo for discussion with Trans Union on the average attorneys' fees on settled cases and the average settlement per case.

- Mr. Cento received a memo summarizing the procedures discussed at the Fall 2003 Trans Union meeting, including specific litigation strategy for making offers of judgment. The memo also directed Mr. Cento (1) to follow up on a particular aspect of a California class action and (2) to settle a certain category of files.

- Mr. Cento worked with in-house attorneys from Trans Union and supervised lawyers in his own law firm on Trans Union matters.  On one occasion, Mr. Schuckit sent a letter to Trans Union's General Counsel to introduce her to three new associates who would be working on Trans Union cases.  Notably, the letter says that Mr. Cento would be supervising the associates' work.

- Mr. Cento attended a meeting with Trans Union's General Counsel and other in-house counsel.

- Mr. Cento worked on Trans Union case procedures for Trans Union associates.

- Mr. Cento attended a two-day Trans Union's FCRA Counsel Conference.  The agenda for the conference included sessions on handling offshore disputes, system features, technology issues, FACTA compliance readiness, and reasonable procedures and reinvestigations for defense counsel discussions.

Trans Union's billing records for individual cases show that Mr. Cento prepared Trans Union 30(b)(6) witnesses for and defended them at depositions on at least twenty-one occasions. Preparation for these depositions included discussions of confidential and proprietary information, much of which was not revealed at depositions.[10]  Additionally, Mr. Cento prepared

---

[10]  *See* Schuckit Aff. (Dkt.28-1) at ¶ 7(G).

5

numerous confidential settlement statements for submission to the court, which were not publicly filed or served on opposing counsel.[11]  He also attended settlement conferences on behalf of Trans Union.[12]

Finally, during his representation of Trans Union, Mr. Cento did defend it in at least two matters related to bankruptcy reporting.[13] He also did research related to a class action alleging inaccurate bankruptcy information reporting.[14]

## Analysis

The question presented is whether Mr. Cento should be disqualified because the matter on which he now represents the putative class is substantially related to his former representation of Trans Union, thus rendering his current representation in violation of Rule 1.9 of Indiana's Rules of Professional Conduct.  Rule 1.9 is grounded in the presumption that attorneys receive client confidences during the course of a representation and that a subsequent representation threatens the compromise of those confidences.  Mr. Cento maintains that the current and prior representations are not substantially related and that even if they are, he is entitled to rebut and has rebutted the presumption that he received confidential information in connection with his representation of Trans Union.

As to Mr. Cento's latter argument—that the rules permit him to rebut the presumption he received confidential information from Trans Union during the course of representing it—the parties have a fundamental legal disagreement.  Trans Union contends that if it has shown that

---

[11]  *See id.*, at ¶ 7(H).

[12]  *See id.*, at ¶ 7(I).

[13]  *See* Trans Union's brief, Dkt. 16, at p.7, n. 2. *See also id.* Ex. A. Schuckit Aff. at 6.A, 7.K.

[14]  *See id.* at p. 7, n. 2.

the two representations are substantially related, the presumption is irrebuttable and it is inappropriate for the court to examine the actual communications between Mr. Cento and Trans Union and to permit Mr. Cento to attempt to rebut the presumption of shared confidences.[15] Therefore, if the court determines that the two representations are substantially related, it will then be required to resolve this issue as well.

As noted above, the threshold question presented is whether Mr. Cento's representation of Trans Union while at Katz & Korin and the Schuckit firm is substantially related to his current representation of a putative class against Trans Union.  If they are substantially related, the court must then determine whether the disqualifying presumption can be rebutted—first from a legal standpoint and then as a factual matter.  But before beginning that analysis, the court will address a finer point.  Even if the court accepts Trans Union's position that a substantial relationship leads to an irrebuttable presumption of confidential communications, that does not mean that a court should never examine the actual attorney/client communications that occurred during the course of the prior representation.  In this case in particular—where the prior representation was not for a single case but for many cases—the nature, scope, content, and quality of the communications between Mr. Cento and Trans Union may, and in fact here do, shed considerable light on just what his earlier representation of Trans Union *was*.  In other words, at least in this case, the actual communications assist the court in determining whether the prior and current matters are substantially related.[16]

---

[15]  Trans Union has nevertheless presented evidence (in the form of an *in camera* submission) from which it argues that Mr. Cento did actually gain confidential information on matters substantially related to this case.

[16]  In describing those communications, however, the court has heeded the concern expressed by some courts that the irrebuttable presumption created by Rule 1.9(a) protects the former client from public airing of the confidential communications the rule is designed to protect.  *See, e.g.,*

Disqualification of counsel "is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Schiessle v. Stephens,* 717 F.2d 417, 420 (7th Cir. 1983) (quoting *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir. 1982)); *see also Owen v. Wangerin,* 985 F.2d 312, 317 (7th Cir. 1993).  In its hesitance, the court is mindful that motions to disqualify may be "misused as techniques of harassment." *Freeman, 717* F.2d at 422; *Morgan v. Calderone,* 2008 WL 544681, *2 (S.D. Ind. Feb. 28, 2008). Furthermore, disqualification imperils the important "prerogative of a party to proceed with counsel of its choice." *Schiessle, 717* F.2d at 420. To balance the interests of both parties as well as to maintain the integrity of the attorney/client relationship, courts view disqualification motions with "extreme caution," placing the burden of proof on the moving party. *Boston Scientific Corp. v. Mirowski Family Ventures, LLC,* 2012 WL 1982114, *1 (S.D. Ind. June 1, 2012) (quoting *Freeman,* 689 F.2d at 722). Nevertheless, the court retains "broad discretion in determining whether disqualification is required in a particular case." *Id.* (quoting *Whiting Corp. v. White Mach. Corp.,* 567 F.2d 713, 715 (7th Cir. 1977)).

### A.    The former and current representations are substantially related.

Mr. Cento consistently characterizes his earlier representation of Trans Union as the defense of many separate, discrete cases, each driven by its own particular facts.  Because the present case is factually dissimilar, he says, it cannot be substantially related to the earlier representation.  The court's examination of the facts, including the substance of the materials submitted for *in camera* inspection, does to some degree bear out this characterization.  A

---

*Westinghouse Electric v. Gulf Oil*, 588 F.2d 221, 224 (7th Cir. 1978).  The court will therefore describe the communications presented for *in camera* review in no more detail than the Second Affidavit of Robert J. Schuckit, Exhibit A to Trans Union's reply brief (Dkt. No. 28-1), which Trans Union filed on the open docket.

significant part of Mr. Cento's tasks in connection with those cases consisted of managing separate cases and making status reports to Trans Union on a regular basis.

Most reported decisions that apply the substantial relationship inquiry involve the comparison of one prior case to the current case and the factual overlap between them.  If the court simply compared the nature of the facts alleged in this case to the facts at issue in any particular case Mr. Cento defended for Trans Union, it would likely not find a substantial relationship.  But that analysis would not be based on a complete and accurate picture of Mr. Cento's prior representation of Trans Union.  Mr. Cento's characterization focuses only on the facts of specific cases rather than on the scope of his legal work on behalf of Trans Union. Where the prior representation was, as here, extensive, lengthy, and included involvement in overarching strategies and litigation approaches, the court should look beyond the facts of any single prior case.  *See, e.g., Battagliola v. National Life Insurance*, 2005 WL 101353 (S.D.N.Y. Jan. 19, 2005).

The evidentiary materials provided the court demonstrate that Mr. Cento's representation of Trans Union included extensive interaction with its in-house counsel, executives, and other employees.  He had access to confidential documents.  He conferred with his client on litigation and settlement strategies in ways that transcend the bounds of any particular case and overlap with this case.  In short, he was—as in *Battagliola*—an extension of Trans Union's in-house legal department.

In the court's view, the primary fact that militates against a finding of substantial relationship is the passage of time.  Seven years have passed since Mr. Cento represented Trans Union. Even with representations extensive in scope, at some point, the changes that normally accompany the passage of time—shifts in key personnel, corporate philosophy, or business

9

focus—may render whatever the lawyer learned in the course of that prior representation irrelevant.  The evidence presented in this case, however, is that the key Trans Union personnel with whom Mr. Cento worked are still with the company and that most of its policies and procedures have remained substantially the same.[17]  On December 20, 2012, Mr. Cento filed a Motion for Leave to File Supplemental Affidavit in Opposition to the Defendant's Motion to Disqualify (Dkt. 39).  In his affidavit, Mr. Cento asserts that he recently learned that Patricia Norris, whom he says was his day-to-day point of contact at Trans Union, has not been involved with consumer FRCA litigation since 2011 and is no longer employed by Trans Union.[18]  This single change in personnel is not enough to alter the fact that Mr. Cento was privy to confidential communications and strategies that transcend the "day-to-day." The court finds that Mr. Cento's former representation of Trans Union is substantially related to the current representation.

**B.     Rule 1.9(a) applies to the disqualification issue presented.**

Mr. Cento argues that even if the representations are substantially related, he is entitled, under Rule 1.9(b), to rebut the presumption that he acquired confidential information from Trans Union that is material to his representation of the plaintiff in this case.  The court disagrees.

Rule 1.9 of the Indiana Model Rules of Professional Conduct addresses a lawyer's duties to former clients. Rule 1.9(a) provides that:

---

[17]  *See* Schuckit Aff. (Dkt.16-2) at ¶ 17.

[18]  The motion for leave (Dkt. 39) is GRANTED.  The court is troubled by two aspects of this filing.  First, in response to the court's question at oral argument, Trans Union emphasized that, despite the passage of time, the key personnel had not changed.  Mr. Schuckit's affidavit sounds a similar theme.  If Mr. Cento's new filing is correct, that assertion was not entirely accurate and should have been corrected.  Second, Mr. Cento's filing at docket 39 is more than was necessary to establish that Ms. Norris is no longer employed by Trans Union.  Inclusion of all the emails he and Ms. Norris exchanged appears to be an effort to create an affidavit she was unwilling to give.

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Rule 1.9(b) provides that:

> A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
> (1) whose interests are materially adverse to that person; and
> (2) about whom the lawyer had acquired information protected by Rules 1. 6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

Although the language of the two subsections is markedly similar, Rule 1.9(a) plainly addresses a more intimate form of prior representation—when a lawyer has himself formerly represented the very client he now opposes. *See Exterior Sys., Inc. v. Noble Composites, Inc.*, 210 F. Supp. 2d 1062, 1068 (N.D. Ind. 2002) (drawing a distinction between the application of two rules now embodied in 1.9(a) and 1.9(b), as amended in 2004). In contrast, Rule 1.9(b) addresses situations where a lawyer's previous *firm* has represented the client now at issue. *Id.* The distinction is important, as courts more stringently restrict a lawyer's representations under 1.9(a), mandating disqualification if a substantial relationship exists between the prior and present representations.

> In the case where a substantial relationship exists and either an entire firm or an individual attorney himself switches sides and represents a new client against a former client, the presumption that confidential information was passed during the first representation is irrebuttable and the attorney or firm cannot avoid disqualification.

*Leathermon v. Grandview Mem'l Gardens, Inc.*, 2010 WL 1381893, at *10 (S.D. Ind. Mar. 31, 2010). *See also Analytica, Inc. v. NPD Research, Inc.*, 708 F.2d 1263, 1267 (7th Cir. 1983) (irrebuttably presuming shared confidences and disqualifying a law firm that itself changed sides with respect to a substantially related matter).

Under a 1.9(b) analysis, however, the presumption of shared confidential information is rebuttable and an attorney may avoid disqualification, despite the existence of a substantial relationship between representations, "'by clear and effective evidence that the attorney in question had no knowledge of the information, confidences and/or secrets related by the client in the prior representation.'" *Leathermon*, 2010 WL 1381893, at *10. This rebuttal is often achieved through evidence of a "Chinese wall." *Analytica*, 708 F.2d at 1267.

Here, Mr. Cento has both personally represented Trans Union and also departed from two firms that represented Trans Union. He argues that a rebuttable presumption analysis—a 1.9(b)-type analysis—applies. (Cento Brief at 23). This would be the appropriate analysis only if Mr. Cento had not also personally represented Trans Union. *Leathermon,* 2010 WL 1381893, at *10. Mr. Cento's position that it also applies here is untenable, for many reasons. First, there is absolutely no authority to support it. At oral argument, Mr. Cento's counsel urged the court's consideration of *Leathermon* as support for his position that he should be permitted to rebut the presumption that he was privy to the confidential information of Trans Union. This is curious, because *Leathermon* soundly defeats this argument. *Id.* Second, applying the standard created by Rule 1.9(b) to lawyers who had personally represented the current adversary would render Rule 1.9(a) superfluous and meaningless. Third, the approach Mr. Cento advances is unworkable and implicates the very concerns courts have articulated as the basis for the irrebuttable presumption created by Rule 1.9(a). In essence, his approach would require Trans Union to identify specific confidential information Mr. Cento received during their relationship, after which he would be entitled to demonstrate that someone, somehow could discover that information outside the attorney/client relationship. Mr. Cento indeed went to great lengths in his briefing and at oral argument to challenge the confidential nature of each piece of

12

information Trans Union cited. This unwieldy approach is not validated by any decision he has cited, and it, in effect, places a burden on Trans Union that is inconsistent with both Rule 1.9(a) *and* 1.9(b). And, as Trans Union points out, that sort of scrutiny would require Trans Union to disclose the very matters the rule is intended to protect. Finally, blurring the lines between the application of Rule 1.9(a) and 1.9(b) would disserve clients, who are entitled to Rule 1.9(a)'s heightened protections of the intimate attorney/client relationship. And it would disserve the legal community, because lawyers benefit from clarity in the standards they must employ when evaluating potential conflicts. Because we have found that Mr. Cento's prior representations of Trans Union bear a substantial relationship to his present representation of Ms. Childress and the class, by operation of 1.9(a), he is irrebuttably presumed to have received confidences, mandating disqualification.

### Conclusion

Trans Union's Motion to Disqualify (Dkt. 15) is GRANTED. Its motion for *in camera* review (Dkt. 29) is GRANTED. The plaintiff's motion to lift stay (Dkt. 36) is DENIED AS MOOT. The request for status conference (Dkt. 38) is DENIED AS MOOT. The motion for leave (Dkt. 39) is GRANTED. No substantive response to the affidavit attached to the motion for leave is required. Counsel are directed to confer and file, by January 8, 2013, a proposed case management plan. The stay for providing responses to any written discovery requests (*see* Dkt. 21) is hereby LIFTED.

So ORDERED.

Date: 12/28/2012

_Debra McVicker Lynch_
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email generated by the court's ECF system